**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROCHONA MAJUMDAR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 C 928 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| C. CHRISTINE FAIR, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this diversity case, plaintiff Rochona Majumdar brings suit against defendant, C. Christine Fair, asserting claims of defamation and false-light invasion of privacy. Defendant moves to dismiss for lack of personal jurisdiction. For the following reasons, the Court denies the motion.

**I.    Background**

The following is a summary of the allegations of the complaint, which the Court must assume true at this early stage. Plaintiff Rochona Majumdar is an associate professor in the Departments of South Asian Languages and Civilizations ("SALC") and Cinema and Media Studies ("CMS") at the University of Chicago ("the University"). She has lived in Illinois for over twenty years. Her husband is also a professor in the University's SALC department.

Defendant C. Christine Fair holds three degrees from the University, including a Ph.D. in SALC. Defendant is now a Professor in the Walsh School of Foreign Service at Georgetown University. She lives in Virginia.

While defendant was studying at the University in the nineteen-nineties, plaintiff's husband made an offensive comment to defendant, which defendant interpreted as an improper sexual

advance. Since then, defendant has made a number of public statements criticizing plaintiff's husband for the comment. Beginning in 2017, defendant began to make public statements critical of plaintiff.

In December 2017, defendant wrote a letter to the Title IX Coordinator at the University, alleging that plaintiff had only come to be hired because her husband "exploited his position" at the University, and her "tenure was a foregone conclusion" for the same reason. (Compl. ¶ 9, ECF No. 1.) Defendant claimed that plaintiff had boasted that she "danced around" tenure, although she had an "unorthodox career trajectory." (*Id*. ¶ 14.) Defendant also alleged in the letter that plaintiff had made "disparaging remarks" about her own students, including "homophobic" and "caste-based" remarks. (*Id.* ¶ 9; *see id.* Ex. A, ECF No. 1-1.)

In or around March 2020, Zain Jamshaid, a former Ph.D. student in the University's CMS department, began making allegations within the University community that plaintiff had sexually harassed and assaulted him in 2015 and 2016. Sometime in the spring of 2020, Jamshaid filed a formal Title IX complaint against plaintiff.

During the same time frame, defendant began to post disparaging statements about plaintiff and her husband on the internet. On March 14, 2020, defendant posted to her blog a piece entitled, "The University of Chicago is a Predator Protection Racket." The blog post primarily consists of the 2017 letter defendant had written to the University's Title IX coordinator. Defendant also reposted the blog post on Twitter. In the tweet containing the link to the blog post, defendant wrote that plaintiff "sexually assaulted" Jamshaid, "mocked him for being gay, Muslim, low-caste, . . . plagiarized him, . . . mocked his national origins and held his visa status over him." (*Id.* ¶ 15; *see also id.* Ex. B.)

On the same day, March 14, 2020, defendant posted another piece to her blog, this one titled "A Sadistic Couple that Preys Together Stays Together?" In this post, defendant alleged that plaintiff "forced [Jamshaid] to let her fondle him": she had allegedly "demand[ed] that [Jamshaid] TA a course with her" and "instructed him to sit next to her while she put her hands on the insides of his thighs." (*Id.* ¶ 17; *id.* Ex. C.) This blog post incorporated a new email that, earlier that same day, defendant had sent to the University's Title IX coordinator. In the March 14, 2020 email to the University's Title IX coordinator, as reposted on defendant's blog, defendant alleged that plaintiff had obtained her position at the University only because her husband "tanked a Hindi job search after short-listed candidates were flown out to give job talks and, after doing so, argued that she should have the job." (*Id.* ¶ 18.) Further, defendant alleged, plaintiff was plainly less qualified than other candidates "by any empirical standard," but it was a "foregone conclusion" that she would obtain tenure, nevertheless, because of her husband. (*Id.*) Defendant concluded by stating that she hoped plaintiff and her husband were "held to account for tormenting myriad students . . . who have been blackmailed into tolerating their sadism for the sake of their careers." (*Id.*)

On April 2, 2020, defendant posted on Twitter that plaintiff had filed a complaint against Jamshaid, in which she had alleged that "the content of HIS [Title IX] complaint constituted sexual harassment OF HER." (*Id.* ¶ 19; *id.* Ex. D.) According to plaintiff, this statement was false. Defendant referred to plaintiff as a "harridan" and to plaintiff and her husband as "sadistic." (*Id.*)

On May 13, 2020, defendant reposted her "A Sadistic Couple That Preys Together Stays Together?" blog post to her Twitter account. In the same Twitter post, defendant stated, "There is ONE serious upside to universities like @UChicago being virtual: it deprives predatory 'professors' like these wretches from abusing students." (*Id.* ¶ 20.)

On May 25, 2020, defendant posted on Twitter that "Roachana [sic] Majumdar is a rabid vulture combing over vulnerable students whom she can exploit and abuse." (*Id.* ¶ 22; *see id.* Ex. G.) In other Twitter posts on or around that day, defendant referred to plaintiff and her husband as "predatory," and stated, "[Y]es, Roachana [sic], . . . I KNOW what you did. Your colleagues KNOW what you did. You have no business being near students." (*Id.* ¶ 23; *see id.* Ex. H.)

In a series of tweets posted on June 2 and June 3, 2020, defendant called plaintiff a "sexual predator with permanent job security" and suggested that she obtained her position at the University because she "bang[ed] a prominent faculty member." (*Id.* ¶ 24; *see id.* Ex. I.) Defendant continued, "The entire notion of the 'trailing spouse' incentivizes this predatory behavior and provides a different kind of response to sexual harassment other than insisting upon accountability." (*Id.*)

On August 16, 2020, defendant posted on Twitter that the University provided plaintiff with a "perquisite of preying upon students" that was unavailable while classes were being conducted remotely due to the COVID-19 pandemic.

On December 28, 2020, defendant posted on Facebook that plaintiff was an "abusive harridan" and a "churail," a derogatory term in Hindi and Urdu. (*Id.* ¶ 26; *see id.* Ex. K.) In this Facebook post, plaintiff invited "SALC people" with whom she had studied at the University to come forward with stories of harassment by plaintiff to help Jamshaid with his claim. Defendant "tagged" a number of people, including, plaintiff alleges, at least one person in Illinois. (*Id.*)

On December 31, 2020, defendant posted on Twitter that Jamshaid is "one of Roch[o]na Majumdar's victims." (*Id.* ¶ 27; *see id.* Ex. L.) In a Facebook post that same day, defendant stated that she is aware of "at least four victims" of harassment by plaintiff, including Jamshaid, whom she identified by name. (*Id.* ¶ 28; *see id.* Ex. M.)

On January 2, 2021, defendant reposted on Twitter a GoFundMe page Jamshaid had created in connection with claims against the University, and she asked for donations, stating that "Rochona Majumdar targeted him because of his numerous vulnerabilities: gay, Ahmadi, from Pakistan, with a visa status contingent upon his student status." (*Id.* ¶ 29; *id.* Ex. N.) Defendant posted Jamshaid's GoFundMe page again on January 3, 2021, stating that plaintiff had harassed and assaulted him. On the same day, she posted the GoFundMe page on Facebook, stating that plaintiff had assaulted and harassed Jamshaid and that plaintiff had participated in a "long reign of predation." (*Id.* ¶ 31; *see id.* Ex. P.)

On January 20, 2021, defendant referred in a Facebook post to plaintiff as a "predator" and stated that she and her husband "need to be brought to account." (*Id.* ¶ 32; *see id.* Ex. Q.) In another Facebook post the same day, defendant stated that plaintiff "hir[ed] a SALC grad student who needed the money to revise her dissertation, which became the basis of her 'book.'" (*Id.* ¶ 33; *see id.* Ex. Q, at 3.) Defendant also reiterated her allegation that plaintiff's husband "tanked a job search" so that plaintiff could get the position, and that plaintiff attained tenure despite her allegedly "pathetic publication record." (*Id.*)

On February 2, 2021, after plaintiff's counsel sent her a cease-and-desist letter, defendant posted on Twitter, "Rochona. You can't pay your 'pooper scooper' lawyer to send nasty grams to the dozens if not more students calling you a monster. But you *can* stop being a monster and make amends to those you have harmed. The truth won't be muzzled. A couple that preys together are reviled together." (*Id.* ¶ 37; *see id.* Ex. U.) On February 13, 2021, in a Twitter post about plaintiff's husband, defendant wrote, "He and his wife are a predatory couple who have [im]miserated many students." (*Id.* ¶ 38; *see id.* Ex. V.)

Plaintiff claims that defendant's campaign of accusations has damaged her reputation "in academic circles and the UChicago community." (*Id.* ¶ 39.) For example, plaintiff was scheduled to participate on February 4, 2021, in a virtual panel discussion of the scholarly work of two colleagues. The two colleagues canceled the event, citing the social media controversy surrounding plaintiff. Additionally, on February 9, 2021, a group of students at the University sent a letter to their professors refusing to participate in a class that would include a podcast featuring plaintiff. The students cited the allegations of sexual assault Jamshaid had made on his GoFundMe page— although Jamshaid did not identify his alleged harasser. Plaintiff alleges "on information and belief" that these students learned of the identity of Jamshaid's alleged harasser via defendant's social media posts.

Plaintiff asserts her claims against defendant in two counts: Count I, for defamation, and Count II, for placing her in a false light. Defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

## II.    Legal Standards

A motion to dismiss pursuant to Rule 12(b)(2) tests whether a federal court has personal jurisdiction over a defendant. *Central States v. Phencorp. Reins Co.*, 440 F.3d 870, 875 (7th Cir. 2006); Fed. R. Civ. P. 12(b)(2). In ruling on a Rule 12(b)(2) motion, courts may consider matters outside of the pleadings. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When a court determines a Rule 12(b)(2) motion based on the submission of written materials without holding an evidentiary hearing, the plaintiff must make a *prima facie* case of personal jurisdiction. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 432 (7th Cir. 2010); *GCIU-Employer Ret. Fund*, 565 F.3d 1018, 1023 (7th Cir. 2009). As such, the plaintiff bears the burden of establishing that personal jurisdiction exists. *N. Grain Marketing, LLC v. Greving*, 743

F.3d 487, 491 (7th Cir. 2014). To determine whether the plaintiff has met its burden, the court may consider affidavits from both parties. *Felland v. Clifton*, 582 F.3d 665, 672 (7th Cir. 2012). When the defendant challenges by declaration a fact alleged in the plaintiff's complaint, the plaintiff has an obligation to go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction. *Purdue Research Found.*, 338 F.3d at 783. Courts must also resolve all factual disputes in the plaintiff's favor. *GCIU*, 565 F.3d at 1020, n.1. Unrefuted facts in defendant's affidavits, however, will be taken as true. *Id.*

"A federal court exercising diversity jurisdiction has personal jurisdiction only where a court of the state in which it sits would have such jurisdiction." *Philos Techs., Inc. v. Philos & D, Inc.*, 645 F.3d 851, 855 n.2 (7th Cir. 2011). Illinois's long-arm statute authorizes personal jurisdiction to the extent permitted by the Illinois Constitution and the United States Constitution. 735 ILCS 5/2–209(c). "[T]here is no operative difference between these two constitutional limits," so a single constitutional inquiry suffices. *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). "The key question is therefore whether the defendants have sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Tamburo v. Dworkin*, 601 F.3d 693, 700-01 (7th Cir. 2010) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

There are two types of personal jurisdiction: general and specific. General jurisdiction exists where a defendant has "continuous and systematic general business contacts" with the forum, while specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d

1272, 1277 (7th Cir. 1997) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 414 n.8 (1984)).

A defendant is subject to general jurisdiction only where its contacts with the forum state are so substantial that it can be considered "constructively present" or "at home" in the state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Defendant has lived and worked outside of Illinois for many years. She plainly does not have the "extensive and pervasive" contacts with Illinois that would subject her to general personal jurisdiction, and plaintiff does not argue otherwise.

Specific jurisdiction exists where three "essential requirements" are met:

First, the defendant's contacts with the forum state must show that it "purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed [its] activities at the state." Second, the plaintiff's alleged injury must have arisen out of the defendant's forum-related activities. And finally, any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.

*Lexington Ins. Co. v. Hotai Ins. Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (quoting *Felland*, 682 F.3d at 673) (internal citations omitted) (alterations in original). In a tort case, to determine whether the defendant's conduct was "purposefully directed" at the forum state, the Seventh Circuit has derived from *Calder v. Jones*, 465 U.S. 783 (1984), a further three requirements: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Felland*, 682 F.3d at 674-75.

This standard is not satisfied merely because the defendant deliberately caused an injury to a person whom he knows to be a resident of the forum state. The plaintiff "'cannot be the only link between the defendant and the forum.'" *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (quoting *Walden v. Fiore*, 571 U.S. 277, 276

(2014)). Instead, "[t]he relation between the defendant and the forum 'must arise out of contacts that the defendant *himself* creates with the forum State.'" *Advanced Tactical*, 751 F.3d at 802 (quoting *Walden*, 571 U.S. at 284). Further, courts must "look to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. Thus, a defendant will be subject to personal jurisdiction in a particular forum if he has "purposefully reached out beyond" his own state and into the forum state to create the necessary contacts. *Id.* (internal quotation marks and alteration marks omitted).

### III. Discussion

Defendant argues that she did not "purposefully direct" her conduct at Illinois and that exercising jurisdiction in Illinois would not comport with traditional notions of fair play and substantial justice.

#### A. Purposeful Direction and Express Aiming

The gist of defendant's argument is that she did not purposefully direct or expressly aim the allegedly defamatory statements at Illinois or anywhere else because she made them in blog and social media posts on the open internet, where anyone could access them in any state or country. In similar circumstances, defendant argues, courts have found that the requisite minimum contacts are lacking. *See, e.g.*, *Blessing v. Chandrasekhar*, 988 F.3d 889, 905 (6th Cir. 2021) ("The plaintiffs do not point to a single case in which a court extended personal jurisdiction based on a defendant's allegedly tortious postings on social media."); *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002).

But these decisions were based in part on the courts' reasoning that the forum states were not the "focal point . . . of the story" in those cases. *Calder*, 465 U.S. at 789; *see Blessing*, 988 F.3d at 905 (defendants' statements concerned plaintiffs' alleged actions in Washington, D.C.,

with little connection to the forum state of Kentucky); *Young*, 315 F.3d at 263 (defendant newspapers' statements were made for benefit of Connecticut readers and focused on Connecticut inmates, who happened to be imprisoned in forum state of Virginia). That is where this case differs.

It is true that, after *Walden*, it is no longer possible, if it ever was, to interpret *Calder* to mean that, when a plaintiff suffers a tort injury in a particular state, the fact that he suffered the injury in that state necessarily suffices to permit the exercise of personal jurisdiction over the accused defendant there. *See Advanced Tactical*, 751 F.3d at 802 (recognizing *Walden*'s abrogation of *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997), in this regard). But *Walden* does not hold that the location of the injury is irrelevant. To the contrary, it explained that, depending on the nature of the plaintiff's claim, and particularly for defamation claims, the location of the injury may be a critical contact.

The *Walden* Court discussed *Calder*—a defamation case, like this one—in some detail, summarizing the decision as follows:

> In *Calder*, a California actress brought a libel suit in California state court against a reporter and an editor, both of whom worked for the National Enquirer at its headquarters in Florida. The plaintiff's libel claims were based on an article written and edited by the defendants in Florida for publication in the National Enquirer, a national weekly newspaper with a California circulation of roughly 600,000.
>
> We held that California's assertion of jurisdiction over the defendants was consistent with due process. Although we recognized that the defendants' activities "focus[ed]" on the plaintiff, our jurisdictional inquiry "focuse[d] on 'the relationship among the defendant, the forum, and the litigation.'" [465 U.S.] at 788 (quoting *Shaffer*, 433 U.S. at 204). Specifically, we examined the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story.
>
> We found those forum contacts to be ample: The defendants relied on phone calls to "California sources" for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the "brunt" of that injury was suffered by the plaintiff in that State. 465 U.S. at 788-789. "In sum, California [wa]s the focal point both of the story and of

10

the harm suffered." *Id.* at 789. Jurisdiction over the defendants was "therefore proper in California based on the 'effects' of their Florida conduct in California." *Id.*

*Walden*, 571 U.S. at 286-87 (internal citations altered). The Court explained that the outcome in

*Calder* was driven significantly by the fact that the particular injury the defendants' libel caused

the plaintiff—the "reputation-based effects"—connected the defendants to the forum state:

> The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons. Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California. ***In this way, the "effects" caused by the defendants' article—i.e., the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to <u>California</u>, not just to a plaintiff who lived there.*** That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction.

*Walden*, 571 U.S. at 287-88 (internal citations omitted) (bold and italicized emphasis added). The

cases are not identical, but *Calder* is similar to this case in ways that defendant elides and that the

Supreme Court, in *Walden*, marked as significant. Most fundamentally, in this case, as in *Calder*,

the injury caused to plaintiff by defendant's alleged defamation is a "reputational injury" that

derives from the diminished esteem in which plaintiff is held by the members of a relevant

community in the forum state. The effects caused by defendant's social media campaign—the

"injury to [plaintiff's] reputation in the estimation" of members of the University of Chicago

community in Illinois—connects defendant's social media campaign to Illinois, not just to a

plaintiff who happened to live there. *Walden*, 571 U.S. at 288. The University of Chicago—and,

therefore, its home state of Illinois—is plainly the "'focal point both of the story and of the harm

suffered.'" *Id.* at 287 (quoting *Calder*, 465 U.S. at 789); *see also Moore v. Cecil*, 488 F. Supp. 3d 1144, 1159 (N.D. Ala. 2020) (where defendant made defamatory statements in press release concerning defendant's efforts to persuade Alabama voters not to vote for plaintiff in Alabama special election, Alabama was the "focal point," and "if [defendant] could have reasonably anticipated being haled into court in some state to defend statements he made in the press release, that State would have to be Alabama") (internal quotation marks omitted); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 654-56 (W.D. Va. 2019) (distinguishing *Young*, 315 F.3d at 263, and finding that Virginia was the "focal point" of defendant's YouTube video and website article falsely accusing the Virginia plaintiff of involvement in the attack that killed Heather Heyer at the 2017 "Unite the Right" rally in Charlottesville, Virginia, reasoning that the "exclusive focus . . . was a Virginia event and a Virginia citizen" and "the harm occurred in Virginia," where the plaintiff "lives and works"). Illinois is where the misconduct defendant accuses plaintiff of committing allegedly occurred, and it is where the injury caused by those allegedly false accusations occurred, so Illinois has a substantial relationship to the accusations.

Defendant contends that this case is different from both *Calder* and *Tamburo v. Dworkin*, 601 F.3d at 706, because she did not directly reach out to individuals in the forum state to prepare her defamatory statements or to circulate them. In *Calder*, the defendants prepared their libelous story by making phone calls to sources in the forum state, and the defendants' newspaper had 600,000 subscribers in the forum state. In *Tamburo*, the Seventh Circuit found that there was personal jurisdiction in Illinois over certain out-of-state defendants where the defendants made allegedly defamatory statements "on their public websites or in blast emails" to Illinoisans, and, in some of these statements, "encouraged [readers] to boycott [the plaintiff's] products" or to "contact and harass him" at his Illinois address, 601 F.3d at 706. Here, defendant maintains that

12

the contacts out of which the claim arises consist only of statements posted on the internet, where any person can read them wherever the person happens to be located; they are not specifically directed at any individual Illinoisans.

In response, plaintiff argues that defendant frequently mentioned the University of Chicago in her Twitter posts by using the "@UChicago" handle, and in a Facebook post, she tagged at least two Illinois residents, including one of plaintiff's current SALC colleagues at the University of Chicago. According to plaintiff, "tagging" someone on Facebook or "mentioning" them on Twitter is "the functional equivalent of sending that person a letter." *Cardno Chemrisk, LLC v. Foytlin*, No. 2014-3932 BLS1, 2015 WL 9275648, at *2 (Mass. Super. Oct. 26, 2015). Defendant replies that the two are not equivalent because including a tag or a mention does not make the post a direct communication between only a sender and a tagged or mentioned recipient; instead, the post is made publicly for all to see.

Defendant's distinction makes no difference. The fact that a Twitter mention or Facebook tag is a means of addressing a public rather than private communication to a particular user does not make it any less an intentional, direct contact. When a Facebook user is tagged or a Twitter user is mentioned, the user receives a notification directing his or her attention to the post, just as an email user receives a notification when he or she receives an email. Defendant does not dispute that numerous courts have found emails to people in the forum state to be relevant contacts for jurisdictional purposes. *See, e.g.*, *Sunny Handicraft (H.K.) Ltd. v. Edwards*, No. 16 C 4025, 2017 WL 1049842, at *7 (N.D. Ill. Mar. 20, 2017) (distinguishing *Advanced Tactical* because it was "not merely fortuitous that the recipients of [defendant's] emails were located in Illinois; rather, [defendant] directed her e-mails deliberately and specifically at Illinois by sending personal messages to her Illinois-based business contacts"). At least in the context of this case, a mention

on Twitter or a tag on Facebook strikes the Court as akin to an email for purposes of personal jurisdiction. By using the "@UChicago" handle in her Twitter posts, it is as if defendant sent open letters to the University of Chicago and posted copies on campus bulletin boards for all to see. The University of Chicago receives the "letter" by receiving a notification about it, and the letter also exists in a public forum where anyone else with interest in the community can read it by searching Twitter for "@UChicago" mentions.

Indeed, the fact that these contacts were public rather than private may strengthen, rather than weaken, the argument that they are sufficiently substantial contacts to permit the exercise of personal jurisdiction. It is difficult to accept defendant's argument that she did not purposefully direct or expressly aim her posts at Illinois, not only because she specifically directed many of them at Illinois-based users such as "@UChicago," but also for the independent reason that the content of the posts suggests that pressuring the University of Chicago to take action against plaintiff and in favor of Jamshaid was the goal of her social media campaign. For example, on March 14, 2020, defendant tweeted the following: "Today a student, whose story I narrated to @uchicago's Title IX office in Dec. 2017, [reached out] to tell me that he has (Thanks Allah) finally filed an official complaint about Rochona Majumdar. This was a brave move as she is vindictive." (Compl., Ex. B.) Defendant replied[1] to the above tweet with the following: "He has been sexually assaulted by this female faculty member who mocked him for being gay, Muslim, low-caste and plagiarized him. She also mocked his national origins and held his visa status over him. **_WHEN WILL THE @UChicago DO SOMETHING TO STOP THIS?_**" (*Id.*) (bold and

---

[1] Defendant's tweets about plaintiff were often composed of "threads"; that is, defendant would reply to one of her own tweets, which permitted readers to see that it was connected to an earlier tweet, and then reply to the reply if she had more to add.

italicized emphasis added). In this tweet, defendant linked to the blog post in which she had reproduced her 2017 letter to the University's Title XI coordinator.

In numerous subsequent tweets, defendant made allegations of objectionable behavior by plaintiff and her husband, used the "@UChicago" handle, and suggested that the University was improperly conniving at bad behavior by its faculty members. In an April 2, 2020 tweet, defendant asked, "For how long will the @UChicago be a predator sanctuary?" (*Id.* Ex. D.) On May 13, 2020, defendant stated, "There is ONE serious upside to universities like @UChicago being virtual: it deprives predatory 'professors' like these wretches from abusing students." In another tweet in what appeared to be the same thread, defendant wrote, "Let me repeat: I really, really hope that these predators ([plaintiff's husband] and Rochona Majumdar) sue me. Discovery will reveal what the @uchicago knew and that despite knowing did nothing to protect student[s]. Instead it protects these boorish veneers for educators." (*Id.*) In a May 25, 2020 Twitter thread, defendant wrote, "@UChicago should be sued into [L]ake Michigan by all of us who have been victimized under its purview." (*Id.*, Ex. H.) In a subsequent tweet in the same thread, she wrote, "I won't shut up until all of their victims--including me--get justice." (*Id.*) In another tweet, she wrote of a person who is "probably an associate of this predatory couple that the @UChicago protects as if they are somehow gods." (*Id.*) In a December 31, 2020 Twitter thread, defendant wrote, "You should hear what @UChicago did to one of Rochana Majumdar's victims. After he filed a Title IX complaint…they retaliated against him and expelled him. #JusticeForZain." In another post in the same thread, she wrote, "We need justice not only for Zain, but for every single one of her victims. *How is it that the University of Chicago gets away with being a predator protection racket for so long*." (*Id.*, Ex. L) (emphasis added).

There are some others, but these examples suffice to show that it is reasonable to infer that defendant was directing or aiming her tweets not only at plaintiff, but also at the University of Chicago and its community in order to shame and pressure the University into protecting Jamshaid and ceasing to "protect" plaintiff and her husband. Further, plaintiff alleges that defendant's actions began to have the effect she desired, in that members of the University of Chicago community were taking up defendant's cause. In particular, plaintiff alleges that a group of students sent a letter to their professors indicating their intent to boycott a class that featured plaintiff's work, citing Jamshaid's allegations, although Jamshaid had not publicly named his alleged harasser. (*Id.* ¶ 40.)

Had defendant simply written in her various Twitter and blog posts about events in Illinois from her home in Virginia, that may not, by itself, have sufficed to create a substantial relationship with Illinois. *See Saah v. Levine*, No. 3:20-CV-01682 (KAD), 2021 WL 3679305, at *6 (D. Conn. Aug. 19, 2021) (citing cases for the proposition that "merely alleg[ing] that Defendant posted allegedly defamatory material concerning out-of-state conduct online . . . is not enough to hale the poster into the state where the plaintiff resides") (internal quotation marks omitted). But some decisions have recognized that internet posts that are "intended to cause others to engage in some action in the forum" may create contacts that satisfy due process. *Id.* (citing *Vangheluwe v. Got News, LLC*, 365 F. Supp. 3d 850, 857 (E.D. Mich. 2019)).

In *Vangheluwe*, for example, one of the defendants falsely tweeted from California that the Michigan plaintiff was the driver who had killed Heather Heyer at the 2017 Unite the Right rally in Charlottesville, Virginia. The defendant's tweet included the plaintiff's home address in Michigan. The court reasoned that the inclusion of the address and the surrounding circumstances of the tweet showed that the tweet was part of a "doxing campaign" designed to induce Michigan

16

residents to engage in acts of "retribution, harassment, or humiliation" against plaintiff. *Vangheluwe*, 365 F. Supp. 3d at 858-60 (internal quotation marks omitted). The court concluded that it was "reasonable to infer that [the defendant's] tweet was intended to cause some action in Michigan or catch the eye of those most able to make contact with the Vangheluwes, *i.e.*, Michiganders[, so it] satisfie[d] the constitutional minimum." *Id.* at 861 (citing *Tamburo*, 601 F.3d at 706 ("In some of [the defendant's] messages, readers were encouraged to boycott Tamburo's products; in others, Tamburo's Illinois address was supplied and readers were urged to contact and harass him.")); *see also Fletcher v. Doig*, 125 F. Supp. 3d 697, 709 (N.D. Ill. 2014) ("[A]lthough Doig's conduct [consisting of sending an allegedly false email to an Illinois auction house, resulting in cancellation of an auction,] originated outside of Illinois, he targeted [the plaintiff's art dealer], whose business was in Illinois, with the express goal of inflicting commercial harm there[, which] satisfied the 'purposefully directed' requirement.") (citing *Tamburo*, 601 F.3d at 707); *Campbell v. Campbell*, 262 F. Supp. 3d 701, 705-06 (N.D. Ill. 2017) ("It is . . . clear that defendant's conduct was expressly aimed at Illinois. He sent the emails directly to [plaintiff's employer], which is located in Illinois. And defendant knew (or at least intended) that plaintiff would be injured in Illinois. . . . The purpose of his messages was clearly to bring her into disrepute with her employer and to get her fired."). This Court agrees with this reasoning in *Vangheluwe*— particularly to the extent it relied on *Tamburo*—and like cases.

The Court concludes that, at least for purposes of this early stage of litigation, plaintiff has shown that defendant created the minimum contacts with Illinois necessary to permit the exercise of personal jurisdiction without offending principles of due process. Illinois is the "focal point" of this "story and of the harm suffered" because Illinois is where the conduct that forms the subject of defendant's offending accusations occurred, and Illinois is where plaintiff's alleged reputational

injury has occurred. Further, defendant reached out into Illinois by making allegedly defamatory statements that targeted Illinois Twitter and Facebook users, and it is reasonable to infer from the allegations that defendant's statements were intended to cause people in Illinois to take action against plaintiff.

Defendant does not apparently dispute that plaintiff's claim arises out of or relates to her social media posts. *See generally uBID*, 623 F.3d at 429-32 (explaining standards for determining whether claims arise out of or relate to contacts). Having found that defendant's social media posts created contacts with Illinois, the Court concludes that plaintiff's claim arises out of or relates to the requisite minimum contacts necessary to satisfy due process.

## B. Traditional Notions of Fair Play and Substantial Justice

That leaves the issue of whether exercising personal jurisdiction over defendant in Illinois would comport with traditional notions of fair play and substantial justice. To conduct this inquiry, courts must weigh a number of factors, including "'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.'" *Campbell*, 262 F. Supp. 3d at 707 (quoting *Felland*, 682 F.3d at 677). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Felland*, 682 F.3d at 677 (internal quotation marks omitted). Concerns of unfairness "usually may be accommodated through means short of finding jurisdiction unconstitutional." *Id.*

Defendant's argument on this point is somewhat thin, but her main point seems to be that forcing her to defend this suit here would be unfair because the burden on her would be high and the forum state's interest in this suit is low. She argues that the claim against her is "based on internet posts published to an international audience about a topic of interest involving not only UChicago and one of its professors, but persons and institutions in positions of power all over the world." (Def.'s Mem. at 11, ECF No. 12.) The Court recognizes that defendant will be burdened to some extent by having to defend this case in Illinois rather than her home state of Virginia, but out-of-state defendants always face that burden, and defendant does not establish that her burden in this regard would be greater than "that routinely tolerated by courts exercising specific jurisdiction against nonresidents." *Felland*, 682 F.3d at 677. To the extent defendant intends to suggest that the forum state's interest in this case is low because her internet posts were available and of interest to a wider audience than the University of Chicago community, the Court is unconvinced. As another district court recently pointed out, this was the case in *Calder* itself, but the Supreme Court was unmoved. *See Gilmore*, 370 F. Supp. 3d at 655 n.25. Further, "[e]vents— even those that garner widespread attention—are most intensely felt in the states and communities where they occur," so "[o]nline publications" about particular events are likely to be of "particular interest" in the states where those events occurred. *Id.* at 655 n.26 (citing *Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1159 (S.D. Fla. 2017) ("Defendants knew [that their article about the Fusion GPS dossier] would be viewed around the world, and given the international scope of its contents, should have anticipated that the effects of the publication might be felt in different fora, including the fora where Plaintiffs are located. Accordingly, Defendants cannot claim surprise at being haled into court.")). Illinois has a strong interest in providing a forum for adjudication of its residents' claims of defamation by out-of-state actors. *See Tamburo*, 601 F.3d at 709. That is

particularly true here, where the "reputational injury" at the heart of the claim seems to have reverberated throughout a community of Illinois residents, namely, the University of Chicago community. *See Walden*, 571 U.S. at 288 (citing *Calder*, 465 U.S. at 788-89).

The next two factors—plaintiff's interest in obtaining convenient and effective relief and the interstate judicial system's interest in obtaining an efficient resolution of controversies—both weigh in favor of exercising jurisdiction in Illinois. Illinois is where the critical events occurred, and it is therefore the forum that provides the most convenient access to witnesses and sources of proof. *See Fletcher*, 125 F. Supp. 3d at 710. The final factor, the "shared interest of the several States in furthering fundamental substantive social policies," is of little significance here in this "'ordinary tort litigation.'" *Id.* (quoting *Abad v. Bayer Corp.*, 563 F.3d 663, 668 (7th Cir. 2009)).

Thus, one factor, the defendant's burden of litigating in the forum, weighs slightly in defendant's favor, and three factors—the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the interstate judicial system's interest in obtaining an efficient resolution of controversies—weigh substantially in plaintiff's favor. The fifth factor is neutral. Weighing all these factors together, the balance tips in plaintiff's favor. The Court concludes that its exercise of personal jurisdiction over plaintiff is consistent with principles of fair play and substantial justice.

Defendant purposefully directed her actions toward Illinois, she created constitutionally minimum contacts with Illinois, and the exercise of personal jurisdiction over plaintiff comports with traditional notions of fair play and substantial justice. Therefore, the Court's exercise of specific jurisdiction over plaintiff does not offend due process.

## CONCLUSION

Defendant's motion to dismiss [11] is denied.  A status hearing is set for November 10, 2021.

**SO ORDERED.**                                      **ENTERED: October 19, 2021**

**HON. JORGE ALONSO**
**United States District Judge**